**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **TERESA R.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:24-cv-2453-MAB** |
| | ) | |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

Plaintiff Teresa R. filed applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act and Supplemental Security Income (SSI) under Title XVI of the Act on September 21, 2021, alleging she was disabled due to multiple sclerosis, chronic sinusitis, respiratory issues, osteoarthritis, cervical disc disease, psoriatic arthritis, neuropathy, and anxiety (Tr. 208–22, 244–54). She alleged a disability onset date of May 19, 2021, which is the date she stopped working due to her conditions (Tr. 208, 216; *see also* Tr. 554–55). Plaintiff's application for benefits was ultimately denied in a written decision issued by Administrative Law Judge Marcus Johns on September 15, 2023 (Tr. 25–46). ALJ Johns determined that Plaintiff had a number of severe impairments, but she nevertheless retained the residual functional capacity ("RFC") to perform light work with some additional postural and manipulative limitations, and therefore, was not disabled. There is no dispute that the ALJ's decision is the final decision of the Commissioner of Social Security (*see* Docs. 12, 19).

Plaintiff is now before the Court, represented by counsel, seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Plaintiff is challenging the manner in which the ALJ formulated her RFC and contends that the ALJ did not adequately account for her symptoms and limitations (Doc. 12). For the reasons explained below, the ALJ's decision is reversed.

## STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 587 U.S. 87, 98 (2019). Under the Social Security Act, a person is disabled if they have an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also* 20 C.F.R. § 404.1505.[1]

When an applicant seeks judicial review of an adverse benefits decision, the court's role is limited to determining whether the ALJ applied the correct legal standard in reaching their decision, whether the ALJ's decision is supported by substantial evidence, and whether the ALJ "buil[t] an accurate and logical bridge from the evidence to [their] conclusion" that the claimant is not disabled. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020)

[1] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, of the DIB regulations. Most citations herein are to the DIB statutes and regulations out of convenience.

(internal citations omitted). Substantial evidence means "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 587 U.S. at 102, 103 (citation omitted). And the ALJ builds the requisite bridge when they "explain [their] decision in such a way that allows us to determine whether [they] reached [their] decision in a rational manner, logically based on [their] specific findings and the evidence in the record." *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). The court reviews the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021).

## THE ALJ'S DECISION

ALJ Johns followed the familiar sequential analysis to reach the conclusion that Plaintiff was not disabled (*see* Tr. 28–42). *See, e.g., Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (describing the five steps).

At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of May 19, 2021, through her date last insured of December 31, 2013 (Tr. 31). At step two, the ALJ found that Plaintiff had medically determinable impairments that were severe and significantly limited her ability to perform basic work activities including: multiple sclerosis, osteoarthritis of the bilateral wrists and hands, cervical disc disorder with radiculopathy, and obesity (Tr. 31). The ALJ also found that Plaintiff's anxiety was non-severe but nevertheless caused mild limitations in her ability to interact with others and her ability to maintain concentration, persistence, or pace (Tr. 31, 32).

At step three, the ALJ determined that Plaintiff's impairments, either alone or in combination, did not meet or medically equal any of the listed impairments of 20 C.F.R. Part 404 (Tr. 33–34). The ALJ then assessed Plaintiff's residual functional capacity ("RFC") using treatment notes, imaging results, medical opinions, and Plaintiff's own statements regarding her activities and symptoms and found that, despite her impairments, Plaintiff retained the ability to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), with some additional postural and manipulative limitations (Tr. 35). Specifically, Plaintiff could:

- lift and/or carry 20 pounds occasionally and 10 pounds frequently;
- stand and/or walk for a total of six hours in an eight-hour workday;
- sit for a total of six hours in an eight-hour workday;
- never climb ladders, ropes, or scaffolds;
- occasionally crawl; and
- frequently perform fine fingering with both of her arms.

(Tr. 35). *See also* 20 C.F.R. § 404.1567(b) and 416.967(b).

At step four, the ALJ concluded that based on the RFC, Plaintiff could still perform her past relevant work as a ticketer as it is generally performed in the national economy (Tr. 41). Accordingly, the ALJ found that Plaintiff was not disabled at any time from May 19, 2021, the alleged onset date, through September 15, 2023, the date of the ALJ's decision (Tr. 42).

## Issues Raised by Plaintiff

1. The Commissioner's analysis regarding Plaintiff's muscle spasms is internally inconsistent, fails to analyze crucial evidence, and the light exertion RFC is not supported by substantial evidence.

2. The Commissioner erred as a matter of law by failing to adequately account for Plaintiff's reaching, handling, and fingering limitations.

3. The Commissioner erred as a matter of law by failing to account for any mental limitations in the RFC despite finding mild mental limitations.

(Doc. 12, p. 4).

## EVIDENTIARY RECORD

Plaintiff was born in September 1965 and has a high school education (Tr. 244, 249). She was 54 years old on the alleged disability date of May 19, 2021, and working as the head cook and kitchen manager at a high school cafeteria (Tr. 61, 62). Prior to that she worked at South Central Outboard disassembling, cleaning, and rebuilding carburetors (which was classified as a "blast equipment tender" position by the vocational expert) (Tr. 63–64, 69, 75). And she worked for a number of years Pinnacle Food Group in various positions, including operating a labeling machine (which was classified as a "ticketer" position by the vocational expert), loading and unloading trucks, and on the production line (Tr. 64–68, 74–75). All of her jobs required her to be on her feet for most of the shift and required lifting in the medium or heavy exertional range (Tr. 74–75).

In September 2020, Plaintiff complained to her primary care physician ("PCP") about progressively worsening joint pain, primarily in her wrists, hands, and fingers (Tr. 351–54). She also reported joint stiffness, numbness and tingling in the fingertips on her right hand, and decreased range of motion in two fingers (*Id.*). The doctor noted that Plaintiff's daily activities, including cooking, dressing, and grasping objects, were "adversely affected" (*Id.*). Non-steroidal anti-inflammatory medication did not help the pain at all (*Id.*). Her doctor chalked it up to primary generalized osteoarthritis (*Id.*).

In November 2020, Plaintiff reported at two separate visits "unbearable" pain in

her right shoulder that radiated to her fingers, numbness and weakness in her right arm, and pain and stiffness in her upper back and neck (Tr. 343–46, 347–50). She said the symptoms had been rapid and aggressive (Tr. 347). On exam, she had pain with range of motion in her neck and loss of sensation in her right middle and index fingers (Tr. 345, 349). She was first prescribed a short course of prednisone and had x-rays of her cervical and thoracic spine taken (Tr. 349–50). Then her doctor prescribed gabapentin and ordered an MRI (345). Plaintiff never had the MRI, however, because insurance denied coverage (Tr. 345; *see also* Tr. 369–76).

On January 11, 2021, Plaintiff saw neurologist, Dr. Victoria Johnson, at the Carle Brain and Spine Institute (Tr. 366). Plaintiff reported having neck pain for the last 10 years, along with pain in both arms that radiates to her fingers (*Id.*). She also reported stiffness and decreased range of motion in her neck (*Id.*). But she also said her symptoms had "improved somewhat" and, on that particular day, she rated her pain as a 1 out of 10 (Tr. 366). Plaintiff told the neurologist that she worked as a cook and was still able to do her job (*Id.*). Other than mildly restricted range of motion when turning her head side to side and an absence of reflexes in her biceps and triceps, Plaintiff's physical exam was normal (*see* Tr. 343–44). She had full motor strength, no tenderness, and special examination techniques to check that nerve and cord compression were negative (Tr. 367, 368). The neurologist diagnosed cervical spondylosis with radiculopathy,[2] and recommended physical therapy, a TENS unit, and continuation of the current

[2] Cervical Spondylosis is arthritis of the neck. CLEVELAND CLINIC, *Cervical Spine*, https://my.clevelandclinic.org/health/articles/22278-cervical-spine (last visited Sept. 29, 2026).

medications (Tr. 368).[3]

Two months later, at a follow-up visit with her PCP, Plaintiff reported new symptoms: pain in her upper cervical spine that radiated to her lumbar spine, along with radicular pain and numbness in her legs (Tr. 338). Plaintiff rated her pain as a 7 out of 10 (*Id.*). She denied having any pain, numbness, or weakness in her arms (*Id.*). Her doctor wrote "[t]his is a chronic problem, with essentially constant pain" (*Id.*). Nothing new was done for her (Tr. 340, 341).

Plaintiff continued searching for answers. In early May 2021, Plaintiff was "evaluated by neurosurgeon with a cervical MRI" at the Carle Clinic in Mattoon, Illinois (Tr. 554, 555). The MRI report is not in the administrative record (*see* Doc. 10-7, Doc. 10-8).[4] Later that same month, Plaintiff began seeing a new primary care provider, Advanced Practice Registered Nurse ("APRN") Kimberly Burgess, who indicated that the MRI showed "signal changes that may be consistent with [multiple sclerosis]" (Tr. 554). Additional MRIs of her cervical spine and brain (with and without contrast) were recommended to determine if her right arm numbness was caused by early multiple sclerosis rather than degenerative disc disease in her cervical spine (Tr. 551, 554, 555).

Plaintiff told Burgess that she had "a long history of intermittent vision changes

---

[3] This appointment was apparently followed by an appointment at the Hospital Sisters Health System on February 23, 2021, for back pain and spine injury, which is what Plaintiff indicated in her Social Security application (Tr. 303). There do not appear to be any medical records pertaining to this appointment in the administrative record.

[4] Records suggest the MRI was completed on May 4, 2021 (*see* Tr. 466, 467). It is unclear who the neurologist was that ordered the MRI or whether Plaintiff was seen in-person by the neurologist around this time.

including floaters" and "a long history of fatigue" (Tr. 554), which are both common symptoms of MS.[5] Plaintiff also complained of neck and arm pain as well as pain in both of her hands and "stiffness" (*Id.*). She said the pain was worse in her right shoulder and arm, "particularly when working." (*Id.*). She had numbness and tingling going down through her right shoulder into her right hand (*Id.*). She had bilateral thumb and hand pain that was severe at times, especially if she was trying to lift or open jars (*Id.*). At rest, her pain was constant and aching, a 3–4 out of 10 (*Id.*). With activity, she had sharp shooting pain that could be as severe as a 10 (*Id.*). Plaintiff reported that lifting, bending over, twisting, and pushing heavy objects all aggravate her symptoms (*Id.*). On exam, Plaintiff had "reduced range of motion in right trapezius[,] tenderness with spasm" and her thumb joints showed "remodeling and swelling" (Tr. 554). APRN Burgess prescribed meloxicam and gabapentin for pain (Tr. 555). She also wrote a note restricting Plaintiff from work because she was "unable to perform the tasks required for cooking in a commercial kitchen" (Tr. 555). This is when Plaintiff alleges that her disability began.

The follow-up MRIs were apparently done on June 30, 2021 (see Tr. 440, 446). Once again, the MRI reports are not in the administrative record (*see* Doc. 10-7, Doc. 10-8). But other records indicate that they confirmed "area of concern for sequela from demyelinating disease," such as MS, as well as significant degeneration in her cervical

---

[5] *E.g.*, NATL. MULTIPLE SCLEROSIS SOC'Y, *Multiple Sclerosis Symptoms*, https://www.nationalmssociety.org/understanding-ms/what-is-ms/ms-symptoms (last visited Sept. 27, 2026).

spine with severe spinal canal stenosis (Tr. 479, 551; *see also* Tr. 446).[6] Plaintiff saw APRN Burgess a week later to discuss the results of the MRIs (Tr. 551). On exam, Plaintiff once again had "reduced range of motion in right trapezius[,] tenderness with spasm" and swollen, "remodeled" thumb joints (Tr. 551). Plaintiff was referred back to neurology for further evaluation (Tr. 552).

Plaintiff indicated in her Social Security application that she saw neurologist Rong Chen at Carle Hospital on September 2, 2021 (Tr. 252). The neurologist's records, however, are not part of the administrative record (*see* Doc. 10-7, Doc. 10-8). But APRN Burgess indicated that the neurologist diagnosed Plaintiff with MS and recommended a disease modifying treatment (Tr. 403). Plaintiff was also diagnosed with severe spinal canal stenosis (*see* Tr. 404, 479).

Plaintiff filed her application for Social Security benefits on September 21, 2021 (Tr. 244–64). She later filled out a Function Report (Tr. 274–81), and so did her husband (Tr. 282–90). Plaintiff said that her symptoms from MS, arthritis, and degenerative issues in her neck include headaches, nausea, chronic pain, fatigue, tremors, neuropathy, and loss of strength (Tr. 274, 279). She also has some vision issues when her MS flares up (Tr. 274). She cannot feel anything with most of her fingers and she has degeneration in her thumbs (Tr. 274). Her symptoms have adversely impacted her ability to lift, squat, bend, stand,

[6] Stenosis is when narrowing in parts of your spine causes your spinal cord (spinal canal stenosis) or nerves (foraminal stenosis) to become irritated, compressed, or pinched. CLEVELAND CLINIC, *Cervical Spine*, https://my.clevelandclinic.org/health/articles/22278-cervical-spine (last visited Sept. 29, 2026), Cervical nerves control movement of the muscles, and provide sensation in, parts of your head, neck, shoulders, arms, wrists, hands, fingers, and thumb. *Id.*

walk, reach, sit, kneel, climb stairs, see, complete tasks, concentrate, and use her hands (Tr. 274, 279).

Plaintiff specifically mentioned that her "hands don't work well" and she has lost fine motor skills (Tr. 274). For example, she said she had to change how she holds a spoon and fork, she can no longer seal a Ziploc bag, she struggles with buttons and some zippers, and she has trouble sorting paper money and change (Tr. 274, 275, 278). Plaintiff's husband likewise reported that she gets "upset because of the loss of fine motor skills, especially when the tremor and pain flare up" (Tr. 282). He corroborated that Plaintiff has trouble holding utensils and has to steady her arm by putting her elbow on the table, and she struggles with buttons, zippers, and counting change (Tr. 284, 287). He also added that her tremors make it hard for her to write a check or read from a paper that she is holding (Tr. 282–290).

Plaintiff reported that she cannot read, work on a computer, write, or work at a table or desk for more than a couple minutes at a time without needing a break due to pain and stiffness in her neck (Tr. 274, 275). She cannot do repetitive movement (Tr. 274). She can no longer lift a pitcher or gallon of milk with one hand or lift and open jars (Tr. 274, 275). Her husband likewise said that she frequently needs help lifting and carrying things, especially if they are hot (Tr. 285). She cannot walk very far because she always has pain in her feet, legs, lower back, and/or hips (Tr. 279). Her husband estimated that she can walk 10 yards on a bad day and maybe 100 yards on a good day before she has to stop and rest (Tr. 288). Pain and fatigue can make it difficult for her to pay attention (Tr. 279; *see also* Tr. 288). And the pain and numbness make it difficult to sleep (Tr. 275).

Her husband similarly reported that the nerve pain makes it hard for Plaintiff to fall asleep and she is "quite often" woken up by tremors throughout the night (Tr. 284).

When asked to describe her days, Plaintiff said she gets up and takes her medication and makes coffee (Tr. 275). She exercises and stretches "the best I can depending on pain and fatigue levels" (Tr. 275). She tries to do household chores like dishes and cleaning, but she can only do a little at a time, and quite often she cannot complete a task and has to finish it the next day (Tr. 275, 276). Her husband likewise said that she "gets fatigued easily" and "struggles with daily chores and activities" but "*tries*" to keep up with housework (Tr. 282, 284, 285) (emphasis in original). She feeds and waters her animals and takes care of their bedding, but her husband frequently helps her with the pets (Tr. 275, 284). She is still able to prepare her own food, but it is usually something simple like soup or sandwiches (Tr. 276, 285). Plaintiff said she "sometimes" tries to cook a meal, whereas she used to cook everyday (Tr. 276). Preparing a meal takes quite a while, has to be something that she does not have to stand over, and she has to take a lot of breaks (Tr. 276; *see also* Tr. 285). She tries to prepare food ahead of time as much as she can on her good days (Tr. 275), and she has to be careful using knives, moving hot pans, and taking things in and out of the oven (Tr. 276). Her husband said she is leery of handling hot liquids because of the tremors (Tr. 285)

Plaintiff and her husband both said she can no longer do near as many activities as she used to (Tr. 278, 287). For example, she used to have hobbies like playing sports, riding horses, hiking, fishing, hunting, sewing, and making jewelry (Tr. 278, 287). She had to quit most of them due to pain, tremors, fatigue, loss of strength, and loss of

movement (Tr. 278, 287, 288). She emphasized that she can no longer do anything that requires fine motor skills or physical stamina (Tr. 278). She said she can still hike and fish but she does not do either very often and struggles with both (Tr. 278). Her husband, on the other hand, said that she is basically limited to watching TV because of her condition (Tr. 287). She can still drive, and she goes to church and Sunday school every week and tries to talk to or see family at least once a week (Tr. 277, 278, 287). But she is limited to just talking and rarely physically participates in any kind of activity (Tr. 287). She also grocery shops once a week, which "takes the better part of a day" (Tr. 277; *see also* Tr. 286).

On March 9, 2022, Plaintiff underwent a physical consultative examination with Dr. Adrian Feinerman (Tr. 420–29). The interview and exam lasted 35 minutes with Plaintiff (Tr. 426). Dr. Feinerman noted that Plaintiff was diagnosed with degenerative disc disease, psoriatic arthritis, and multiple sclerosis (Tr. 421, 426). There is no indication that Dr. Feinerman reviewed any of Plaintiff's MRIs or records from her neurologist, or that he was aware Plaintiff had severe spinal and foraminal stenosis at multiple levels in her cervical spine (*see* Tr. 420–26). Plaintiff identified neck pain as the problem that most interfered with her ability to work (Tr. 426). She also complained of tremors and blurred vision, and she endorsed fatigue, trouble sleeping, numbness, tingling/burning, headaches, anxiety and depression, nausea, skin issues associated with psoriasis, and issues with sinusitis (Tr. 422, 423–24). Plaintiff told Dr. Feinerman that she could walk approximately 50 feet, stand for four minutes, and sit for five minutes (Tr. 422). She said she could squat and bend, and she allegedly denied any problem with fine or gross

manipulation (Tr. 422). Dr. Feinerman stated that Plaintiff "is not felt to be reliable" (Tr. 420), but he gave no indication as to why (see Tr. 420–29). Perhaps it was because her mental status exam showed she was disoriented to person, place, and time and had severe memory loss (Tr. 426).

On physical exam, Plaintiff had full range of motion in all of her joints and her spine (Tr. 425). There was no redness, warmth, thickening, or effusion of any joint (*Id.*). She ambulated normally without an assistive device and was able to walk 50 feet (*Id.*). She had no difficulty with getting on/off the exam table, tandem walking, standing on her toes, standing on her heels, squatting and rising, or rising from a chair (*Id.*). Her muscle strength was normal and there was no spasming (Tr. 426). Her grip strength was strong and equal bilaterally (Tr. 425). Dr. Feinerman observed a "mild intention tremor," but Plaintiff's finger to finger test and finger to nose test were "intact" (Tr. 426).[7] Dr. Feinerman said Plaintiff's fine and gross manipulation were normal (Tr. 426), and his report included a chart indicating that Plaintiff was able to do the following tasks with both hands, with no difficulty: open door using knob, squeeze blood pressure cuff bulb, pick up a coin, pick up and hold a cup, pick up a pen, button/unbutton, zip/unzip, tie shoelaces, turn a page, and oppose thumb and index finger (Tr. 427). Dr. Feinerman concluded that Plaintiff could "sit, stand, walk, hear, speak, lift, carry, [and] handle objects" (Tr. 426), and he did not opine that Plaintiff had any restrictions whatsoever in

---

[7] "An intention tremor generally occurs when you are moving. It becomes stronger if you grasp or reach for something, or move your hand or foot to a precise spot." NATL. MULTIPLE SCLEROSIS SOC'Y, *Tremor*, https://www.nationalmssociety.org/understanding-ms/what-is-ms/ms-symptoms/tremor (last visited September 26, 2026).

her ability to function (*see* Tr. 420–29).

Records also appear to indicate that Plaintiff saw her neurologist again in March 2022 (*see* Tr. 479). However, notes from that visit are not in the administrative record (*see* Doc. 10-7, Doc. 10-8). Repeat MRIs of brain and cervical spine were done on March 30, 2022 (Tr. 440–41, 446–47). The brain MRI report indicates "innumerable" white spots in the white matter of Plaintiff's brain, with additional spots within the cerebellum, and "minimally within the pons," all of which appeared to be similar to the lesions visualized in the previous June 2021 MRI; there were "no definite new lesions identified" (Tr. 440). However, there was an area in the left frontal lobe that was possible for active demyelination (Tr. 440). The cervical spine MRI report shows the same signal change (or lesion) on her spinal cord at C2 identified in the previous MRIs (Tr. 446). It shows degenerative disease resulting in spinal canal stenosis at multiple levels and moderate or severe foraminal stenosis at multiple levels (*Id.*). The degeneration was most advanced at C5-C6, where disc osteophyte complex was causing severe spinal canal stenosis and pressing on her spinal cord (Tr. 446 (indicating "ventral cord is flattened by degenerative change" and "a disc osteophyte complex causes sever central canal stenosis with ventral cord deformity")). There is no indication as to what Plaintiff's neurologist made of the results (*see* Doc. 10-7, Doc. 10-8).

Next came a psychological consultative examination with Shannon Walker, Ph.D., on April 27, 2022 (Tr. 431–33). Plaintiff talked about the physical reactions she has to stress and nervousness and said that she is easily overwhelmed (Tr. 431). Dr. Walker noted that Plaintiff has never seen any mental health professions but takes bupropion prescribed by

her PCP (Tr. 432). Plaintiff's mood was at times anxious and she appeared "restless related to nervousness" (Tr. 431). Dr. Walker also noted (three times, in fact) that Plaintiff's "[p]osture and gait appeared pained" (Tr. 431, 432, 433). On exam, Plaintiff was oriented to person, place, and time and she had "adequate" memory (Tr. 432, 433). Her fund of information and her attention were likewise "adequate," but her calculation skills and abstract thinking were "poor" (*Id.*). Dr. Walker diagnosed unspecified anxiety but did not opine that Plaintiff had any restrictions in her ability to function (Tr. 433).

On May 6, 2022, Plaintiff's application for Social Security benefits was denied on initial consideration. The state agency reviewing psychologist, David Voss, opined that Plaintiff was mildly limited in her ability to understand remember or apply information, her ability to adapt or manage herself, her ability to interact with others, and her ability to maintain concentration, persistence, and pace (Tr. 88–90, 97–99), but Dr. Voss did not include any restrictions on Plaintiff's RFC to accommodate her mental limitations (Tr. 92, 101). The non-examining state agency physician, Dr. Ranga Reddy (who is an anesthesiologist), determined that Plaintiff was capable of medium work, except that she was limited to climbing ladders, ropes, and scaffolds only occasionally and crawling only occasionally (Tr. 91–92, 100–01). Plaintiff's claim was accordingly denied (Tr. 123, 128). Plaintiff asked the agency to reconsider, and in October 2022, a state agency reviewing psychiatrist, Dr. Gayle Williamson, and a second non-examining agency physician, Dr. James Madison (who is a urologist) agreed with the previous assessments (Tr. 104–21), and Plaintiff's claim was once again denied (Tr. 140, 145).

Amidst the agency denials, Plaintiff continued undergoing evaluation and

treatment. Plaintiff saw her neurologist again on August 17, 2022, at the Carle Clinic in Mattoon. The notes from this visit *are* the one and only notes from Plaintiff's treating neurologist in the administrative record (Tr. 477–82).[8] The notes state that Plaintiff "has neck pain, coming to arms with numbness/tingling in her arms, stiffness in four limbs, intermittent out of balance, [and] blurry vision in the past" but "overall, she is still functioning" (Tr. 479).[9] Plaintiff had no new symptoms since the last visit and "she feels great" (Tr. 480). Recent MRI of her brain and cervical spine showed multiple lesions and severe spinal canal stenosis (Tr. 479). Clinically she has been stable . . . [h]er gait is stable[, and] no clear signs of myelopathy (Tr. 479).[10]

Follow-up MRIs were taken again on October 5, 2022 (Tr 436–38). The brain MRI showed the same lesions in the white matter of Plaintiff's brain; there were no new or enhancing lesions suggesting active demyelination (Tr. 438). The cervical spine MRI showed the same signal change (or lesion) on her spinal cord at C2 and "redemonstrate[ed] . . . moderate to severe multilevel degenerative changes throughout the cervical spine, not significantly changed from the prior study," which "result in severe spinal canal stenosis at C4-C5, C5-C6, and C6-C7 as well as multilevel foraminal

[8] They were obtained from MyChart rather than directly from the provider (Tr. 477–82), which suggests Plaintiff most likely provided them.

[9] It appears that this portion of the notes was possibly taken from a previous visit, perhaps Plaintiff's initial visit with Dr. Chen in September 2021 (*see* 479–480).

[10] Cervical myelopathy is compression of the spinal cord in your neck. CLEVELAND CLINIC, *Cervical Myelopathy*, https://my.clevelandclinic.org/health/diseases/cervical-myelopathy (last visited Sept. 29, 2026). Common symptoms include neck pain or stiffness, numbness or tingling in hands and arms, muscle weakness in hands and arms, loss of balance and difficulty walking, and difficulty with fine motor skills.

stenosis" that is severe at four levels (Tr. 436). There is no indication as to what Plaintiff's neurologist made of the results (*see* Doc. 10-7, Doc. 10-8).

Plaintiff saw NP Burgess five times during the last quarter of 2022, primarily for weight loss management (Tr. 515, 518, 521, 527, 529). On two occasions, the notes reflect that Plaintiff's current physical activity regimen included walking and that her gait was normal (Tr. 527, 529). But on December 1, 2022, Plaintiff reported very limited physical activity due to her MS symptoms (Tr. 518). Specifically, she had been having "increased episodes of spasticity . . . that resulted in significant muscle spasm and then several days of soreness and fatigue following" (Tr. 518).[11] Her gait was "slightly ataxic" (Tr. 518). NP Burgess told Plaintiff to follow-up with her neurologist about the spasticity but gave her a prescription for baclofen (a muscle relaxer) in the meantime (Tr. 519). At the end of the month, Plaintiff was still reporting difficulty with physical activity due to MS symptoms, spasticity was listed as an ongoing problem, and her gait was "slowed" (Tr. 515).

On six occasions from January 2023 through May 2023, spasticity was listed as an "ongoing problem" in NP Burgess's notes (Tr. 485, 489, 502, 505, 509, 512). In February 2023, Plaintiff complained to NP Burgess of general body pain, which she felt was an MS flare-up (Tr. 505). In March 2023, she reported that walking was complicated by her MS

---

[11] Spasticity is "one of the more common symptoms of MS" and it

> [R]efers to feelings of stiffness and a wide range of involuntary muscle spasms. . . . Spasticity may be as mild as the feeling of tightness of muscles or may be so severe as to produce painful, uncontrollable spasms of extremities . . . Spasticity may also produce feelings of pain or tightness in and around joints and can cause low back pain.

UNIV. OF PITTSBURGH MULTPLE SCLEROSIS CARE CENTER, *Spasticity,* https://www.ms.pitt.edu/symptom-management/spasticity (last visited September 26, 2016).
we

and frequent flares (Tr. 489).

On July 5, 2023, APRN Burgess provided a medical source statement (Tr. 558). She indicated that, since Plaintiff's disability onset date, Plaintiff had MRIs showing plaques characteristic of MS and had experienced weakness, numbness, stiffness, double vision or other visual disturbances, paresthesias, other emotional disturbances, and "significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity demonstrated on physical examination." APRN Burgess opined that Plaintiff can work two hours per day. She can stand for 15 minutes at one time and for 60 minutes total in a workday. She can lift ten pounds occasionally but nothing frequently. And she can use her left arm and her right arm to work occasionally. APRN Burgess estimated that Plaintiff would be off-task 5% of the time due to her cognitive impairments and 25% of the time due to her physical impairments. (Tr. 558).

On July 10, 2023, Plaintiff appeared for a hearing before ALJ Johns (Tr. 48–85). The ALJ asked Plaintiff a raft of questions related to her past work (*see* Tr. 58–71). He asked her no questions about her impairments, but her attorney did. Plaintiff testified that she is never 100% pain free (Tr. 76). She tries to walk to keep her muscles and joints loose, but she cannot walk all that far (Tr. 76). She estimated the absolute farthest she can walk is about 100 yards, but "that's pushing it, and that's in a lot of pain" (Tr. 76). She cannot stand comfortably because she has constant pain in her feet, so she's "constantly changing position when [she] stand[s]" (Tr. 76–77). She estimated that the longest she can stand is about 10 minutes before she has to sit (Tr. 77). She can only sit for about 10 to 15 minutes before she needs to stand or lie down (Tr. 77–78). In fact, Plaintiff remarked during the

hearing, "I have been struggling this whole time" and "I need to stretch my legs . . . I need to stand, or I need to go over onto my side a little bit. . . . About 10 to 15 minutes . . . I need to just go straight flat out . . . on my side" (Tr. 77–78). The heaviest weight she lifts is "about 20 pounds maybe" but "that's not very often" and she can do it "only once, maybe twice" before she has to step back and rest for a while (Tr. 79). And she has to "be careful" how she lifts things—she has to first make sure her feet are stable underneath her and she has to pick the object up with both hands (Tr. 79).

Plaintiff testified that she can still feed, bathe, and dress herself (Tr. 78). But she has neuropathy in her fingers, so holding utensils can sometimes be very painful and she has to hold it just right (Tr. 78). She also has a tremor in her hands (Tr. 80). The tremor is unpredictable but happens quite often; she said she had tremors at least four days in the past week (Tr. 79). She said she can still button her clothes, zip a zipper, and tie her shoes but it is sometimes a struggle (Tr. 78). She later said that she has "lost a lot of [her] fine motor skills" (Tr. 80). The tremors make it hard to even punch a button or to grab and lift anything because she does not have any control or strength in her hands (*Id.*).

The ALJ then presented the vocational expert ("VE") with some hypothetical questions. If Plaintiff was limited to *light* work but could never climb ladders, ropes, or scaffolding and occasionally crawl, the VE testified that none of Plaintiff's past work as performed would be available, but she could still work as a Ticketer as described by the Department of Transportation, which is a light duty job (Tr. 81; *see also* Tr. 74). If a limitation to frequent fingering was added, she could still work as a Ticketer as described by the Department of Transportation (Tr. 81).

If Plaintiff was limited to *sedentary* work but could never climb ladders, ropes, or scaffolding and occasionally crawl, none of Plaintiff's past work as performed would be available (Tr. 81–82). There would also be no other jobs in the national economy because Plaintiff has no transferable skills to a sedentary level (Tr. 82).

Finally, the VE testified that the typical employer tolerance for off-task behavior is 10% of the workday, or roughly 6 minutes per hour (Tr. 84). Any off-task behavior beyond that is "work-preclusive" (Tr. 84). Employers' tolerance for absenteeism is up to six absences per year, and anything more would be work-preclusive (Tr. 83–84). Arriving late or leaving early counts as a full day missed (Tr. 84).

## DISCUSSION

Plaintiff contends, broadly speaking, that the ALJ did not adequately account for her symptoms and limitations in formulating the RFC. A claimant's RFC is "the maximum that a claimant can still do despite [their] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008); 20 C.F.R. § 404.1545(a)(1), (3). The ALJ must determine the claimant's RFC based on "all the relevant evidence in [the] case record," which includes the objective medical evidence, as well as statements from medical sources, the claimant's own statements about their symptoms and limitations, and statements from non-medical sources, like family, friends, neighbors, and agency personnel. 20 C.F.R. § 404.1545(a)(1), (3); *see also Craft*, 539 F.3d at 676.

The ALJ must explain how the RFC accounts for and accommodates all of the claimant's limitations and how the evidence in the record supports the RFC. *See Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020) ("[T]he ALJ must account for the totality of a

claimant's limitations in determining the proper RFC.") (internal quotation marks and citation omitted); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (ALJ must "explain how she reached her conclusions about [claimant's] physical [and/or mental] capabilities.") (citing *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 352 (7th Cir. 2005)); Social Security Ruling 96-8p ("SSR 96-8p"), 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion . . . ."). This explanation must "build a logical bridge from the medical evidence to its conclusions regarding . . . [any] limitation attendant to its residual functional capacity determinations." *Ghiselli v. Colvin*, 837 F.3d 771, 779 (7th Cir. 2016).

**A. Mental Limitations**

The Court turns first to Plaintiff's last challenge—that the ALJ erred when he did not account for her mental limitations in determining the RFC (Doc.12, pp. 17–21). Plaintiff contends that the ALJ's hypothetical questions to the vocational expert were also flawed because they did not include her mild mental limitations (*Id.* at pp. 20–21).

When determining an applicant's residual functional capacity, "the ALJ must evaluate *all* limitations that arise from medically determinable impairments, even those that are not severe . . . ." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) (per curiam) (emphasis added). Likewise, "[w]hen an ALJ poses a hypothetical question to a vocational expert, the question must include *all* limitations supported by medical evidence in the record." *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018) (emphasis added) (citation omitted). *See also DeCamp v. Berryhill,* 916 F.3d 671, 676 (7th Cir. 2019) (holding ALJ erred by not giving the vocational expert any basis to evaluate claimant's

mild mental limitations). *But see Delong v. Saul*, 844 F. App'x 894, 900 (7th Cir. 2021) (holding ALJ did not err because hypothetical questions posed to vocational expert accounted for mild limitations in concentration, persistence, and pace).

Here, at step two, the ALJ credited the state agency psychological consultants' opinions that Plaintiff's anxiety caused mild limitations in concentration, persistence, or pace ("CPP") and in her ability to interact with others (Tr. 31, 32). The ALJ seemed to account for Plaintiff's CPP problems when he asked the vocational expert about employers' tolerance for off-task behavior (*see* Tr. 83–84). *See Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019). The ALJ, however, did not include any social limitations in his hypotheticals to the vocational expert (*see* Tr. 80–85). That leads the Court to believe the ALJ had ostensibly concluded that Plaintiff's mild limitation interacting with others did not require any corresponding social limitations in the RFC. When it came to formulating Plaintiff's RFC, however, the ALJ did not impose any restrictions corresponding to either of Plaintiff's mild mental limitations, and he also provided no explanation whatsoever as why no restrictions were necessary (*see* Tr. 35–41). In fact, the ALJ's RFC discussion never even mentioned that Plaintiff was mildly limited in CPP and in her ability to interact with others (*see id.*). This was clear error.

The Commissioner nevertheless argues that the record substantially supports the ALJ's conclusion that Plaintiff's mild mental limitations did not warrant any RFC restrictions, and points to the ALJ's discussion at Step Two of his decision (Doc. 19, p. 11). The problem with that is the ALJ ended his discussion at Step Two by explicitly stating that "[t]he limitations identified . . . are *not* a residual functional capacity assessment" (Tr.

33) (emphasis added). *See also* SSR 96-8p, 1996 WL 374184, at *4 ("[T]he limitations identified in the "[P]aragraph B" . . . criteria are not an RFC assessment . . . . The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment . . . .") The ALJ seemingly promised to provide a "more detailed" RFC assessment "reflect[ing] the degree of limitation . . . found in the . . . mental function analysis" (Tr. 33). But the ALJ never delivered.

The RFC discussion contains mention of only a few, scattered pieces of information related to Plaintiff's anxiety. It states at the beginning that anxiety was one of the conditions Plaintiff said contributed to her disability and that she said her pain and fatigue made it difficult for her to pay attention and finish what she starts (Tr. 35). Then three pages later, the ALJ mentioned that Plaintiff exhibited "appropriate affect and demeanor" at appointments with her PCP in March and May 2023 (Tr. 38). Another three pages later, the ALJ said that Consultative psychological examiner Shannon Walker, Ph.D.'s "examination supports a finding for nonsevere mental limitations" (Tr. 41). That is all the ALJ says in the RFC discussion even remotely related to Plaintiff's mental limitations. The ALJ never tied those pieces of evidence into any kind of explanation as to why he was not imposing any restrictions related to Plaintiff's mental limitations (*see* Tr. 35–41). Even if the Court reads those snippets against the backdrop of the ALJ's discussion at Step Two, it is still not enough for the Court to find that the ALJ properly considered all of the evidence of Plaintiff's mental limitations or that the ALJ sufficiently explained his decision not to impose any corresponding restrictions. *But see Kruckow v. Bisignano,* No. 23-2433, 2026 WL 27807, at *2–3 (7th Cir. Jan. 5, 2026).

In sum, the ALJ's decision fails to demonstrate that he fairly evaluated the record regarding Plaintiff's mental impairments and limitations in assessing her RFC. And the decision wholly failed to provide an adequate "logical bridge" between the evidence and the determination that Plaintiff's RFC did not require any restrictions related to her mild mental limitations. The ALJ's omission is clear error that requires remand. *See Vrdoljak v. Kijakazi*, 665 F. Supp. 3d 923, 930 (N.D. Ill. 2023) (finding clear error where ALJ omitted claimant's mild mental limitations from hypotheticals to vocational expert and failed to explain why claimant's mental limitations did not factor into her RFC); *Karen A. v. Kijakazi*, No. 1:21-CV-03076-MG-SEB, 2023 WL 2643235, at *5 (S.D. Ind. Mar. 27, 2023) (collecting cases finding ALJ by failing to account for mild mental limitations when assessing RFC).

**B. Spasms**

Plaintiff argues that the ALJ ignored critical evidence of muscle spasms related to her multiple sclerosis and the significant effect they have on her ability to work (Doc. 12, pp. 6–8). As a result, she claims the RFC does not accurately reflect her full limitations and is not based on substantial evidence (*Id.*). The Court agrees.

The ALJ repeatedly mentioned there was only "one report of acute spasm," which came at a visit in December 2022, when Plaintiff reported an increase in muscle spasms that left her sore and fatigued for a couple days afterwards, and her provider noted that Plaintiff was walking with an ataxic gait (Tr. 39; *see also* Tr. 37, 38). The ALJ made clear that he thought Plaintiff's spasms were *not* "persistent and ongoing," (Tr. 38, 39), even going so far as to call Plaintiff's complaints of spasms "rare" (Tr. 39). And he used this as

a reason to discount Plaintiff's credibility as to limiting effects of her symptoms and to support the RFC finding that Plaintiff remained capable of light work with a couple additional limitations (*see* Tr. 38, 39).

The ALJ's reliance on the absence of corroborating medical is particularly problematic when one considers that the ALJ was missing some of the most significant medical records regarding Plaintiff's MS—those of her neurologist, who was the doctor primarily responsible for monitoring, assessing, and treating her MS. It is evident that there are notes from at least two neurologist's appointments (but perhaps more) that are not in the record, including the visit where Plaintiff was first evaluated for and diagnosed with MS in September 2021, and another visit in March 2022.

The ALJ's discussion also does not reflect a fair evaluation of medical records that he did have, which show that spasms and/or spasticity was mentioned far more than once.[12] NP Burgess noted spasms at the May 2021 visit that occurred right after Plaintiff's initial MRI (Tr. 554). She noted them again at the next visit in July 2021 (Tr. 551). In April 2022, the consultative psychologist noted Plaintiff's "[p]osture and gait appeared

---

[12] Spasms are just one of the ways in which spasticity can present. Spasticity can present in a variety of ways from muscles feeling stiff, heavy, and difficult to move, to sensations of tightness or pain, involuntary movements like muscle spasms, cramps, or jerking movements, or a bouncing in the muscles called clonus. UNIV. OF PITTSBURGH MULTPLE SCLEROSIS CARE CENTER, *Spasticity,* https://www.ms.pitt.edu/symptom-management/spasticity (last visited September 26, 2016); OVERCOMING MS, *MS Spasticity,* https://overcomingms.org/about-multiple-sclerosis/symptoms-ms/spasticity (last visited Sept. 29, 2026); U.S. Dep't of Veterans Affairs, Multiple Sclerosis Centers of Excellence, *Managing Spasticity in Multiple Sclerosis*, https://www.va.gov/MS/LEARN_ABOUT_MULTIPLE_SCLEROSIS/Managing_Spasticity_in_Multiple_Sclerosis.asp (last visited Sept. 29, 2026).

pained," (Tr. 431, 432, 433), which could be indicative of spasticity.[13] In August 2022, Plaintiff's neurologist documented "stiffness in all four limbs," (Tr. 479), which could also reflect spasticity.[14] Then in December 2022, NP Burgess noted Plaintiff was having "increased episodes of spasticity . . . that resulted in significant muscle spasm and then several days of soreness and fatigue following" and had a "slightly ataxic" gait (Tr. 518). At the end of December 2022, Plaintiff was still reporting difficulty with physical activity due to MS symptoms, spasticity was listed as an ongoing problem, and her gait was "slowed" (Tr. 515). Spasticity continued to be listed as an ongoing problem in NP Burgess's records on six occasions from January 2023 through May 2023 (Tr. 485, 489, 502, 505, 509, 512, 515).

The Commissioner downplays the inclusion of spasticity in the ongoing problem list, noting that those same treatment records "rarely described her muscle spasms when discussing her current subjective symptoms" (Doc. 19, p. 8). This argument is a non-starter for two reasons. First, the ALJ never provided this reasoning; in fact, as already stated, the ALJ never even mentioned Nurse Burgess's records listing spasticity as an

---

[13] *See* NATL. MULTIPLE SCLEROSIS SOC'Y, *Walking (Gait) Difficulties*, https://www.nationalmssociety.org/understanding-ms/what-is-ms/ms-symptoms/walking-gait-difficulties (last visited Sept. 29, 2026) (indicating that spasticity in the form of muscle tightness, stiffness or spasms can interfere with gait).

[14] *See* Ben Thrower, et al., *Recognition, Description, and Variability of Spasticity in Individuals With Multiple Sclerosis and Potential Barriers to Clinician-Patient Dialogue: Results From SEEN-MSS, a Large-Scale, Self-Reported Survey*, 26 Int'l J. MS Care 75 (2024), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC10930809/#i1537-2073-26-2-75-b3 (study conducted by survey of nearly 1,200 people with MS showed they describe spasticity in many different ways; commonly used descriptors include *muscle tightness*, *stiffness*, *muscle cramping*, and *pain*); *See also id.* (spasticity often underreported because patients were confused by what they were feeling, did not have the language to describe the symptoms they are experiencing, did not recognize what they were feeling was spasticity, or thought it was simply a part of MS and/or could not be treated and thus not worth mentioning).

ongoing problem. *Phillips v. Astrue*, 413 F. App'x 878, 883 (7th Cir. 2010) ("We confine our review to the reasons offered by the ALJ and will not consider post-hoc rationalizations that the Commissioner provides to supplement the ALJ's assessment of the evidence."). Second, there could be good reason as to why spasticity was not described in the current subjective symptoms portion of the notes. Plaintiff's visits to APRN Burgess in 2023 were not for MS symptoms or complications; they were for unrelated issues, like sinus problems, Covid-19, a lump on her jaw, and weight loss management (*see* Tr. 485–490, 502–513). It seems Plaintiff likely had no reason to run through the litany of MS symptoms she was experiencing at those appointments. And APRN Burgess's notes naturally focus on the acute problem Plaintiff was having, or the issue she was following up on, rather than gratuitously cataloging Plaintiff's current MS symptoms. *See Milliken v. Astrue*, 397 F. App'x 218, 223 (7th Cir. 2010) (criticizing ALJ's "weak reason" for discrediting claimant's claim of fatigue because medical record mentioned only numbness in feet and noting claimant "likely had no reason" to complain about fatigue when appointment was "a consult for a second opinion about . . . leg and foot numbness and dragging"). Another possibility is that Plaintiff complained about spasms/spasticity but APRN Burgess did not include it in the current subjective symptoms portion of the notes because Plaintiff was not actively in the throes of muscle spasms during her appointments and, therefore, it was just listed as an ongoing problem.

At any rate, if the ALJ had questions about why spasticity was listed in the ongoing problem list but not mentioned in the current subjective symptoms portion of those same records, then he could have and should have asked Plaintiff direct questions at the

hearing to clarify how frequently she experienced spasms and whether she reported this symptom to APRN Burgess. *See Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015) (stating that "[t]he ALJ has a duty to fully develop the record before drawing any conclusions . . . ."). But again, the ALJ never even took note of Nurse Burgess's records listing spasticity as an ongoing problem.

In sum, the ALJ overlooked a large swath of evidence regarding Plaintiff's spasms and spasticity. That, in turn, led to the ALJ failing to give any true consideration to Plaintiff's claim that her spams left her sore and fatigued for several days and how that would affect her ability to perform work at the light duty level on a full-time basis.

It is essential for the ALJ to accurately and fairly discuss how often Plaintiff experienced spasms and other forms of spasticity during the time period at issue, how severe it was, and how it affected Plaintiff's ability to function. Spasticity, and particularly spasms, can be notoriously debilitating. *E.g.,* Thrower, *supra* n.14 ("For those with MS, it has been well documented that spasticity can result in physical disability and mobility issues, profoundly impacting quality of life, functioning, and performing activities of daily living, more so as the disease progresses") And the vocational expert testified that Plaintiff could not maintain employment if she experiences as few as six "bad days" a year that cause her to miss work.

**C. Manipulative Limitations**

Plaintiff argues that the ALJ erred by failing to adequately account for her limitations in reaching, handling, and fingering (Doc. 12, pp. 10–15). The Court agrees.

With respect to fine fingering, the ALJ determined that Plaintiff was capable of

frequent fine fingering (Tr. 35). "'Frequent' means occurring from one-third to two-thirds of the time," meaning the ALJ thought Plaintiff was able to use her fingers for fine activities "for a total of approximately 6 hours of an 8-hour workday." Social Security Ruling 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).

On its face, this conclusion seems difficult to justify given that Plaintiff has been diagnosed with multiple sclerosis, severe spinal and foraminal stenosis in her neck, and osteoarthritis, has complained for years about pain, numbness, and tingling in her shoulders, arms, hands, and fingers and difficultly using her hands, has demonstrated degeneration in her thumbs and loss of sensation in her fingers, and has developed an unpredictable tremor in her hands. However, the Court will affirm the ALJ's decision so long as it is supported by substantial evidence and a logical explanation. *See Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) ("[E]ven if reasonable minds could differ concerning whether [the claimant] is disabled, we must nevertheless affirm the ALJ's decision denying [their] claims if the decision is adequately supported.") (citation omitted).

In the portion of his discussion regarding Plaintiff's fine fingering capabilities, the ALJ acknowledged that Plaintiff said she gets tremors in her hands on an unpredictable basis that significantly affect her fine motor skills, and that Dr. Feinerman observed the tremor (Tr. 38). The ALJ also acknowledged that Plaintiff reported numbness, tingling, and stiffness in her arms and hands and demonstrated diminished sensitivity in two of her fingers (Tr. 38). He also acknowledged that Plaintiff had been diagnosed with MS, cervical stenosis, and osteoarthritis (Tr. 39). But he ultimately thought this evidence was

outweighed by:

- Dr. Feinerman's report indicating that Plaintiff demonstrated normal fine and gross manipulative abilities and strong and equal bilateral grip;
- Plaintiff's subjective report to Dr. Feinerman that she had no issues with fine and gross manipulation;
- Neurology notes from August 17, 2022, indicating that Plaintiff had no focal weakness and moved all four limbs equally; and
- Plaintiff's statement to the psychological consultative examiner that she took care of most of the cleaning and cooking in the house.

(Tr. 38). The ALJ concluded that "the overall evidence supports frequent fine fingering to adequately address the diminished sensation in her two finger joints and diagnosis for osteoarthritis" and to account for "possible intermittent effects of her multiple sclerosis and cervical stenosis." (Tr. 39). The ALJ reasoned that, "[g]reater limitation is not supported on the basis of normal strength, movement, and manipulative abilities consistently demonstrated, and the lack of observed significant tremors in her hands." (Tr. 39).

None of the facts the ALJ relied on nor the explanation he gave are sufficient for the Court to affirm his decision. Starting with the fact that Plaintiff had no focal weakness and moved all four limbs equally at an appointment with her neurologist, that just means she did not have weakness affecting only a specific location, such as one limb or one side of the body. MEDLINE PLUS, *Focal Neurologic Deficits*, https://medlineplus.gov/ency/article/003191.htm (last visited Sept. 29, 2026). The Court does not see how it speaks to Plaintiff's ability to do fine fingering tasks for six hours a day, five days a week, and the ALJ did not connect those dots in his decision.

The same goes for Plaintiff's statement to the psychological consultative examiner that she took care of most of the cleaning and cooking in the house. For one, the ALJ failed to meaningfully acknowledge anywhere in his decision critical, qualifying details about the cooking and cleaning that Plaintiff did (*see* Tr. 28–42). Both Plaintiff and her husband stated that she struggles mightily with household chores, can only do a little bit at a time, and is quite often unable to get through small tasks (like washing the dishes) and has to finish them the next day. The food she prepares is usually something simple, like soup or sandwiches, and she has to be very careful using knives and moving hot items. Generally speaking, an individual's minimal daily activities done only with significant limitations, like Plaintiff's, do not establish they are capable of working full-time.[15] More specifically, the ALJ did not explain—nor is it clear to the Court—how the limited cooking and cleaning that Plaintiff does relates to or sheds any light on her ability to perform fine fingering for 6 hours of an 8-hour workday.

Next, the Court is skeptical that Plaintiff reported to Dr. Feinerman that she had no problems with fine or gross manipulation. Plaintiff had consistently and repeatedly reported otherwise both before and after the consultative examination (Tr. 76, 78–80, 274–81, 351, 554). At any rate, the ALJ does not explain why this one purported statement that

---

[15] *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("The claimant's] ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace."); *see also, e.g.*, *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("[Claimant] *must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts.").

tended to show Plaintiff was doing well outweighed and overrode the multitude of contrary statements. *O'Connor-Spinner*, 627 F.3d at 621 ("An ALJ must explain why he does not credit evidence that would support strongly a claim of disability, or why he concludes that such evidence is outweighed by other evidence.").

The Court is similarly skeptical as to how Plaintiff could have possibly demonstrated totally "normal" fine and gross manipulation skills and absolutely no difficulty completing any of the tasks with either hand, like Dr. Feinerman said, when she was simultaneously exhibiting a mild intention tremor and potentially in the midst of an active MS attack (*see* Tr. 440 (March 20, 2022 MRI showing possible active demyelination in front lobe)). But even accepting Dr. Feinerman's findings as true, Plaintiff's ability to complete each task a single time during a motor skills evaluation that lasted mere minutes says nothing about how long she could perform those activities over the course of an 8-hour workday, five days a week. The ALJ acknowledged this limitation in Dr. Feinerman's opinion when it came to sitting and standing (*see* Tr. 40 ("The opinion of Dr. Feinerman is not persuasive, however. . . . Dr. Feinerman opined the claimant can sit and stand but opted not to opine for how long she could perform those activities in an 8-hour workday.), but inexplicably, not when it came to fine fingering. The inconsistent treatment of these two aspects of Dr. Feinerman's report is illogical. *See Liapis v. Bisignano*, 180 F.4th 946, 952 (7th Cir. 2026) (holding ALJ's decision illogical where ALJ dismissed a medical opinion as unpersuasive because it was based on one-time evaluation of claimant but found opinions of four other doctors, each of whom had also only evaluated claimant once, persuasive).

As for the explanation the ALJ gave, the Court is completely confounded as to what the ALJ meant when he said Plaintiff "consistently demonstrated" normal manipulative abilities. (Tr. 39). As far as the Court can tell from the records, Dr. Feinerman is the only doctor who ever specifically tested Plaintiff's manipulative abilities.

The Court is also bewildered as to the significance of "the lack of observed significant tremors in her hands" (Tr. 39). Plaintiff said she has a tremor. Her husband said she has a tremor. Dr. Feinerman said she has a tremor. It is completely unclear to the Court why additional corroboration by other medical sources is necessary. To the extent the ALJ's statement is more about the severity of the tremor, the Court is still confused. As the National Multiple Sclerosis Society explained, "a significant tremor might not let you write at all while a minor tremor may at times affect your handwriting."[16] In other words, whether mild or significant, a tremor during the workday would unquestionably impair Plaintiff's ability to perform fine fingering. It is simply not clear how the ALJ determined that limiting Plaintiff to frequent fine fingering adequately accounted for the difficulties she would inevitably have.

It is possible that if Plaintiff's fine fingering was more limited that she would be precluded from employment. *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Problems manipulating objects by hand reduces the number of jobs available to a

---

[16] NATL. MULTIPLE SCLEROSIS SOC'Y, *Tremor (Shaking) Due to Multiple Sclerosis*, https://www.nationalmssociety.org/understanding-ms/what-is-ms/ms-symptoms/tremor (last visited Sept. 29, 2026).

disability applicant.") (citation omitted). But the ALJ did not ask the vocational expert about the consequences of any stricter limitations on fine fingering.

The Court also agrees with Plaintiff that the ALJ erred by not discussing why he imposed no limits on reaching or gross manipulation (handling). Plaintiff complained for years about severe pain in her shoulder, arm, wrists, hands, and fingers, along with stiffness, weakness, tingling, and numbness. She repeatedly demonstrated decreased sensation in two of her fingers and she has visible degeneration in her thumbs. She reported things like it was difficult to "grasp objects" (Tr. 351), it was very painful when she tried to lift or open jars (Tr. 275, 554), and she can no longer lift a pitcher or a gallon of milk with one hand (Tr. 275). Plus, there is objective evidence that showing she has MS and severe spinal stenosis, which are consistent with, and serve to validate, her subjective statements about her symptoms.[17] The ALJ did not grapple with this evidence nor explain how he determined that Plaintiff was still capable of light work (which requires lifting or carrying ten pounds frequently and up to twenty pounds occasionally), and did not necessitate any gross manipulation limitations.[18]

---

[17] MULTIPLE SCLEROSIS SOC'Y OF AM., *Pain*, https://mymsaa.org/msinformation/symptoms/pain/ (last visited Sept. 29, 2026) (MS can cause nerve pain); *Id.*, *Numbness*, https://mymsaa.org/ms-information/symptoms/numbness/ (last visited Sept. 29, 2026) (MS can cause numbness ranging from the feeling of pins and needles to a burning sensation); MAYO CLINIC, *Spinal Stenosis*, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (spinal stenosis in neck can cause numbness, tingling or weakness in arms and hands, and trouble with fine motor skills).

[18] The Bureau of Labor Statistics defines gross manipulation as "seizing, holding, grasping, turning, or otherwise working with hand(s). This includes instances when fingers are used as an extension of the hand to hold or operate a tool." U.S. BUREAU OF LABOR STATISTICS, *Gross and Fine Manipulation*, https://www.bls.gov/ors/factsheet/gross-and-fine-manipulation.htm (last visited Sept. 29, 2026).

Because of the errors identified in this Order, the Court cannot say that the ALJ's decision is supported by substantial evidence and a logical explanation. Therefore, the ALJ's decision must be reversed. The Court wants to emphasize, however, that this Order should not be construed as an indication that it believes the ALJ was required to reach a certain conclusion about Plaintiff's functional limitations, or that Plaintiff is entitled to benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Plaintiff Teresa R.'s applications for Social Security Disability Insurance Benefits and Supplemental Security Income is **REVERSED** and **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. §405(g), for further proceedings consistent with this Order. The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: September 30, 2026**

Mark A. Beatty

**MARK A. BEATTY**
**United States Magistrate Judge**

Examples include a teacher using a board eraser, a graphic designer using a computer mouse, and a driver operating steering wheels and gear shifts. *Id.*